## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

TINA M. PALMER                          CASE NO. 19-11020

     *Plaintiff,*                       HON. LAURIE J. MICHELSON
*v.*                                    DISTRICT JUDGE

COMMISSIONER OF SOCIAL                  HON. PATRICIA T. MORRIS
SECURITY,                               MAGISTRATE JUDGE

     *Defendant.*
_____/

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON CROSS MOTIONS FOR SUMMARY JUDGMENT (ECF No. 14, 15)

## I.      RECOMMENDATION

Plaintiff Tina Palmer challenges Defendant Commissioner of Social Security's final decision denying her claims for Title II Disability Insurance Benefits ("DIB")*. The case was referred to me for review.[1] (ECF No. 17); *see* 28 U.S.C. § 636(b)(1)(B); E.D. Mich. LR 72.1(b)(3). For the reasons below, I conclude that substantial evidence supports the Commissioner's decision. Accordingly, I recommend **DENYING** Plaintiff's Motion for Summary Judgment, (ECF No. 14)[2], **GRANTING** the Commissioner's Motion, (ECF No. 15), and **AFFIRMING** the Commissioner's final decision.

---

[1] The case was originally referred to Magistrate Judge Mona K. Majzoub. (ECF No. 3.) Subsequently, the case was reassigned to me via text-only order. (ECF No. 17.)
[2] Plaintiff titled this motion as a Motion to Remand Pursuant to Sentence Four.

II.   **REPORT**

A.   **Introduction and Procedural History**

Plaintiff's application for DIB was filed on May 13, 2016. (ECF No. 11, PageID.270–3.) For purposes of DIB, she initially alleged she became disabled on March 3, 2016. (*Id.*, PageID.270.) She subsequently amended her alleged onset date to July 16, 2016. (*Id.*, PageID.284.) The Commissioner denied the claim. (*Id.*, PageID.150–167.) Plaintiff then requested a hearing before an administrative law judge ("ALJ"), which occurred May 7, 2018. (*Id.*, PageID.81–114.) The ALJ issued a decision on August 1, 2018, finding that Plaintiff was not disabled. (*Id.*, PageID.66–75.) The Appeals Council denied review on February 19, 2019. (*Id.*, PageID.34–36.) Plaintiff sought judicial review on April 8, 2019. (ECF No. 1, PageID.1–3.) The parties have filed cross-motions for summary judgment and briefing is complete. (ECF Nos. 14–16.)

B.   **Standard of Review**

The court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). The district court's review is restricted solely to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F App'x. 502, 506 (6th Cir. 2014) (internal quotation marks omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted). "[T]he threshold for such evidentiary sufficiency is not high. . . . It means—and means only—'such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion.'" *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).

The Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). The Court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id*. at 286. (internal citations omitted).

### C.     Framework for Disability Determinations

Disability benefits are available only to those with a "disability." *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. § 1382c(a)(3)(A). The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.

> (ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

(iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled.

(iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

(v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. § 404.1520; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and the fact that [he or] she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). The claimant must provide evidence establishing the residual functional capacity, which "is the most [the claimant] can still do despite [his or her] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).

The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

4

### D.   2018 ALJ Findings[3]

Following the five-step sequential analysis, the ALJ determined that Plaintiff was not disabled. (ECF No. 11, PageID.75.) At step one, the ALJ found that Plaintiff's last date of insured status was March 31, 2018, and that she had not engaged in substantial gainful activity since her alleged onset date of March 3, 2016 through March 31, 2018. (*Id.*, PageID.68.) At step two, the ALJ concluded that Plaintiff had the following severe impairments: obesity, arthritis in the hands and hips, status-post right total hip arthroplasty, headaches, and depression. (*Id.*) These impairments did not meet or medically equal a listed impairment in step three. (*Id.*, PageID.69.) Next, the ALJ found that Plaintiff had the residual functioning capacity to perform

> light work as defined in 20 CFR 404.1567(b) except she needed to sit/stand at will; occasionally climb, balance, stoop, kneel, crouch, and crawl; frequently handle and finger bilaterally; with no exposure to the hazards of moving machinery and unprotect[ed] heights; frequent exposure to the non-

---

[3]   Plaintiff previously applied for DIB in 2014. (*See* ECF No. 11, PageID.118.) She was denied by the agency and the ALJ. (*Id.*, PageID.118, 128.)

In 2016, the ALJ found Plaintiff to have the following severe impairments: rheumatoid arthritis, fibromyalgia, history of right hip arthroscopy, spondylitic changes of the lumbar spine, migraine headaches, and depression. (*Id.*, PageID.120.)

Next, Plaintiff's residual functioning capacity was generally the same, when compared to her 2018 RFC: occasional limits to postural positions; no work around moving machinery or unprotected heights; frequent fingering and handling is allowed; and Plaintiff can perform simple, routine, repetitive work. The 2016 ALJ also limited Plaintiff from concentrated exposure to odors, dusts, gases, fumes, and temperature extremes, and did not limit Plaintiff to work with sit/stand option at will. (*See Id.*, PageID.122.)

Finally, Plaintiff was found to be capable of performing past relevant work as a cashier. (*Id.*, PageID.126.) Alternatively, there was other work in the national economy that Plaintiff could perform, with her RFC.

Since Plaintiff's current application under review was a subsequent application seeking benefits for a distinct period of time, this application is "entitled to [its own] review" and *res judicata* does not apply to bind the current ALJ. *Early v. Comm'r of Soc. Sec.*, 893 F.3d 929, 933 (6th Cir. 2018). This "'[f]resh review is not blind review'" therefore the ALJ considering a subsequent application "can properly consider a previous ALJ's RFC assessment and errs only when he considers the previous RFC a mandatory starting point for the analysis." *Gale v. Comm'r of Soc. Sec.*, 2019 WL 8016516, at *5 (W.D. Mich. Apr. 17, 2019), quoting *Early*, 893 F.3d at 934.

weather-related extremes of cold and heat; in simple, routine, repetitive work.

(*Id.*, PageID.70–1.) At step four, the ALJ found Plaintiff unable to perform any past relevant work. (*Id.*, PageID.74.) Finally, at step five, the ALJ determined that Plaintiff could perform a significant number of jobs in the economy. (*Id.*) This included "representative unskilled occupations at the light exertional level such as information clerk . . . ; office helper . . . ; and router . . . ." (*Id.*, PageID.75.) Accordingly, Plaintiff was found not to be disabled. (*Id.*)

### E.     Administrative Record

### 1.     Overview of Medical Evidence

In general, as the ALJ listed, Plaintiff has the following severe medical issues: obesity, headaches, arthritis in the hands and hips, right total hip arthroplasty, and depression. (*Id.*, PageID.68.)

As of February 2018, Plaintiff is 64 inches (or 5 feet 4 inches) tall, and weighs 190 lbs. (*Id.*, PageID.899.) This equals a body-mass index of 32.61. (*Id.*)

Plaintiff's migraine headaches have long been an issue for Plaintiff and were considered as part of her prior unsuccessful application. Medical records from Memorial Neurological Institute, while Plaintiff was under the care of Dr. Rany Aburashed describe Plaintiff's history:

> The onset of the migraine headache has been chronic and has been occurring in a persistent pattern. The course has been constant. The migraine headache is described as mild. . . . Precipitating factors include stress. Aggravating factors include light and noise. The migraine headache has no relieving factors. Associated features include blurred vision (at times).

(*Id.*, PageID.378.) Previously, Plaintiff was prescribed Topamax for her migraines, and at this point, Plaintiff's prescription was increased to 150 mg twice daily. (*Id.*, PageID.380.) Dr. Aburashed observed "Overall Tina continues to do very well in regards to her headaches. She relates that her migraines are essentially resolved however at times she has what appears to be tension type headaches related to cervical muscle spasming." (*Id.*, PageID.373.) Further, Plaintiff's condition appeared to be controlled with this medication. (*Id.*, PageID.473.) But, later, it was reported that "[Plaintiff] continues to struggle with between 15 and 19 headache days per month the majority of which are quite severe and debilitating. We have tried her on a myriad of different preventative agents . . . without significant benefit." (*Id.*, PageID.469.) Plaintiff proceeded with a trial of Botox chemodenervation at subsequent appointments. (*Id.*, PageID.890, 894.)

Plaintiff's chronic obstructive pulmonary disorder (COPD) was discussed in records from Owosso Medical Group by Dr. Azmy Allam. (*See e.g.*, *Id.*, PageID.347.) in March 2016, Dr. Allam noted that "[Plaintiff] complains of shortness of breath, chest tightness, wheezing, cough (unsure of color), chills and pleuritic chest pain (at times) but denies fever. Shortness of breath is aggravated by climbing stairs and exertion. . . . The respiratory symptoms are described as mild (COPD)." (*Id.*) Physical exams of Plaintiff reveal that her chest and lungs are "clear without wheezes, rales or rhonchi, normal excursion with symmetric chest walls, normal resonance . . . ." (*Id.*, PageID.348.) Dr. Allam reported that the spirometry at that appointment was reviewed, and "[t]here was significant improvement in FVC [forced vital capacity] when compared to prior study." (*Id.*)

The results of later chest and lung exams reveal the same clear report as indicated above. (*See id.*, PageID.494, 495). But by March 16, 2017, it was reported that Plaintiff had a significant decline in FVC and FEV1 (forced expiratory volume) compared to prior study. (*Id.*, PageID.494.) Further, positive changes were reported in September 2017, where Plaintiff's lungs were "clear to auscultation bilaterally, no wheezes, rales, rhonchi" and that "Spirometry today revealed significant increase in both FEV1 and FVC when compared with prior. . . . Patient complains of no respiratory symptoms at this time." (*Id.*, PageID.482.)

In May 2016, a medical record from the Asthma, Allergy, and Immunology Center indicated that "[Plaintiff] has been getting sick often and had recently been treated for exacerbation of asthma several times in the last six months." (*Id.*, PageID.352.) Physical examination of plaintiff at this appointment, and later appointments revealed that auscultation of lungs was equal bilaterally with no adventitious sounds. (*Id.*; *Id.*, PageID.383, 385, 387.) Later, Plaintiff completed an asthma questionnaire on July 2, 2017. (*Id.*, PageID.297.) In this report, Plaintiff stated that she was not hospitalized, nor sought treatment from in an emergency room, doctor's office, or urgent care facility within the last year. (*Id.*, PageID.296.)

In January 2017, Plaintiff underwent right-hip arthroplasty. (*Id.*, PageID.527.) At a post-operative visit with Kristina Yaklin, NP, Plaintiff reported no post-operative complications; her "symptoms are improved compared to preoperative"; "Post operative pain has been mild." (*Id.*, PageID.778.) One year later, at a one-year check-up following the surgery with Dr. Taunt, Plaintiff "states she has been having issues with pain in her

buttocks muscle but she feels as though it may be related to sciatica rather than her hip." (*Id.*, PageID.902.) Plaintiff also reported that her left hip was getting worse. (*Id.*) Plaintiff further reported that there was no pain at this time, she could walk less than five blocks, climb stairs up and down with a bannister, and she was extremely satisfied with joint replacement. (*Id.*) Dr. Taunt's plan following this appointment was "[Plaintiff] is encouraged to engage in any activity [she] desire and is comfortable. I discourage impact loading activities, or lifting items greater than 50 pounds as repetition of these can lead to component failure." (*Id.*, PageID.903.) About one month later, Dr. Taunt discussed with Plaintiff non-surgical alternatives to manage her arthritic left hip, but also mentioned consideration of hip replacement surgery. (*Id.*, PageID.900.) At this time, Plaintiff also underwent an injection of dexamethasone sodium phosphate and triamcinolone acetonide. (*Id.*)

In 2016, Plaintiff was found to have osteoarthritis at the base of the first digit of her right hand. (*Id.*, PageID.407.) In October 2016, Plaintiff complained of numbness. (*Id.*, PageID.474.) At this time, Plaintiff's sense touch was intact and her upper and lower extremities' strength were rated 5/5. (*Id.*, PageID.477.) Later, in 2017, a musculoskeletal examination showed that a grind test on Plaintiff's right hand/wrist was positive and negative for her left hand/wrist; allen's test was negative bilaterally; and a normal 2016 EMG was noted. (*Id.*, PageID.760.) In October 2017, Plaintiff's sense of touch continued to be intact, and her upper and lower extremities strength continued to be rated 5/5. (*Id.*, PageID.469.)

Health Delivery Inc. records indicate that Plaintiff had moderate depression and that this was something to continue to monitor. (*Id.*, PageID.369.) Her depression symptoms related to chronic pain. (*Id.*) Later, in September 2016, Plaintiff reported disturbed sleep, and she was prescribed Abilify. (*Id.*, PageID.791.) This was later changed to Cymbalta. (*Id.*, PageID.776.)

### 2.    Application Reports and Administrative Hearings

#### a.    Plaintiff's Reports

##### i.  Function Report

Plaintiff completed a function report on April 3, 2016 for her application for DIB. (ECF No. 11, PageID.305.) Plaintiff reported that her condition limits here ability to work. She stated that "[s]tanding or sitting long period[s] of time hurts both [her] hips." (*Id.*, PageID.298.) She has "spurs and [two] herniated disc in my back which makes it hard to sit or stand for long periods of time." (*Id.*) She has "bad migraines that come and go a lot . . . ." (*Id.*)

Plaintiff stated that, on a typical day: she wakes up at 4:00; takes headache medication and (later) three other medications; makes coffee; makes breakfast for her husband (depending on how she feels); at 11:00, she cleans the house and goes outside to try to walk; takes pain medication; naps because she is tired; makes dinner; and goes to bed by 10:00. (*Id.*, PageID.299.)

Plaintiff doesn't provide care for another person, but she and her husband have and take care of a dog. (*Id.*)

Plaintiff's condition does not affect her ability to bathe, care for her hair, shave, or feed herself. (*Id.*) Plaintiff indicated she sometimes needs help dressing and using the toilet. (*Id.*) Plaintiff's condition affects her sleep, she tosses and turns and is frequently awake. (*Id.*) Plaintiff's husband will remind Plaintiff to take her medication. (*Id.*, PageID.300.) Plaintiff prepares meals daily but she indicated that preparing meals takes longer because of pain. (*Id.*)

Plaintiff does household chores, which include dusting, laundry, vacuuming, and picking up things. (*Id.*) It takes her 10 minutes to dust and she does so every two weeks; 4 hours to pick things up on a daily basis; 8 hours for laundry once a week; and 2 hours to vacuum once a week. (*Id.*) Her husband does the yard work. (*Id.*, PageID.301.)

Plaintiff tries to go outside every day. (*Id.*) Plaintiff will either drive a car or ride in a car. (*Id.*) She can go out alone. (*Id.*) She will also shop for groceries in stores. (*Id.*) She goes about once a week, and it takes about an hour, with her stopping. (*Id.*)

Plaintiff can take care of and handle money. (*See Id.*) Specifically, she can pay bills, count change, handle a savings account, and use a checkbook. (*Id.*) Her ability to handle money has not changed with her current condition. (*Id.*, PageID.302.)

Plaintiff's hobbies include watching TV and watching birds. (*Id.*) Plaintiff said that it hurts to stay in one spot for these activities, so she doesn't stay in one spot for long. (*Id.*) Plaintiff also spends time with others. (*Id.*) She speaks with her mom on the phone, and her kids will visit when they can. (*Id.*) But Plaintiff did indicate that "pain has a way of making you angr[y] when you don't mean to." to say that she, at times, has problems getting along with others. (*Id.*, PageID.303.) Plaintiff shops on a regular basis at Walmart. (*Id.*,

11

PageID.302.) She does not need reminders to go places, nor does she need someone to accompany her. (*Id.*)

Plaintiff claims her condition affects her abilities. Specifically, she indicates that lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, stair climbing, memory, completing tasks, concentration, using hands, and getting along with others all have been affected. (*Id.*, PageID.303.) She can walk for 40–50 feet, before resting for 2–3 minutes, and resuming walking. (*Id.*) Her attention and her ability to follow written or spoken instructions is negatively affected by her medication. (*Id.*) Plaintiff can get along with authority figures, if they are in agreement. (*Id.*, PageID.304.) She has never been fired for problems with getting along with other people. (*Id.*) She gets upset when she handles stress, but she can "deal with it" with time. (*Id.*) Plaintiff uses a cane, which she stated was prescribed in June 2015. (*Id.*) She uses it whenever she has trouble. (*Id.*) Plaintiff also takes topiramate, and with that she has the side effects of memory loss and trouble with concentration.

Before Plaintiff's current condition, she was able to work full time, walk, and dance. (*Id.*, PageID.299.)

### ii.  Asthma Report

Plaintiff completed an asthma questionnaire on July 2, 2017. (*Id.*, PageID.297.) Plaintiff's asthma attacks have not resulted in the last year in either hospitalization, emergency room treatment, or treatment at a doctor's office or urgent care facility. (*Id.*, PageID.296.) Asthma attacks usually last 10–20 seconds, doing anything—including sitting sometimes—can bring on an asthma attack. (*Id.*) Plaintiff has been prescribed Anoro

and Ventolin to control asthma. (*Id.*) Ventolin is an inhaler, and Plaintiff uses it when she has an asthma attack, which could be zero- to five-times a day. (*Id.*) Plaintiff indicated that in between attacks, she experiences wheezing and she can be short of breath. (*Id.*) Plaintiff described that her activities are affected by attacks "com[ing] on when they please." (*Id.*) She said strong perfume will also cause an attack. (*Id.*)

### b.    Plaintiff's Testimony at the Administrative Hearing

Plaintiff testified that she is 53 years old and is presently married. (ECF No. 11, PageID.86–7). Her husband is disabled because of his back, and he does not work. (*Id.*, PageID.87.) She also does not work. (*Id.*, PageID.89.) Plaintiff last worked in 2013.[4] (*Id.*, PageID.90.) Plaintiff has a high school education. (*Id.*, PageID.89.)

In this household, only Plaintiff and her husband reside there. (*Id.*, PageID.88.) The income for the household is the husband's disability compensation. (*See id.*, PageID.89.) They do not receive food stamps. (*Id.*, PageID.90.)

Plaintiff testified as to her work with three employers David L. Stechschulte Family Corporation, Millennia Housing Management, and Mid-State Consultants. (*Id.*, PageID.90–1.) Plaintiff worked as a cashier for Stechschulte. (*Id.*, PageID.90.) In that position, she stocked shelves and did paperwork. (*Id.*) The job also entailed standing and sitting. (*Id.*, PageID.91.) At this job, she was able to carry at least 20 pounds. (*Id.*) At Millennia Housing, she was a secretary. (*Id.*, PageID.95.) In this position, Plaintiff sat for two-thirds of the time. (*Id.*, PageID.94.) At Mid-State Consultants, she was a

---

[4] *See also* Earnings Records, *id.*, PageID.275, 280.

secretary/receptionist. (*Id.*, PageID.93.) She sat at this job about two-thirds of the time. (*Id.*) The most weight she would have lifted was less than ten pounds. (*Id.*, PageID.94.)

Plaintiff testified about her medical records. Her right hip was replaced on January 10, 2017. (*Id.*, PageID.96.) At the time of the hearing, her left hip was not replaced. (*Id.*) Plaintiff has sciatic problems with her right hip. (*Id.*, PageID.97.) She also has two herniated discs, spurs on her spine, and problems with her left hip. (*Id.*, PageID.100.) Plaintiff has undergone physical therapy. (*Id.*, PageID.97.) Plaintiff has a cane, and she uses it "quite often". (*Id.*, PageID.96.) Plaintiff explained her experience with fibromyalgia[5]: specifically, it was "overactive nerves" that she "felt . . . in [her] arms." (*Id.*, PageID.100.) Plaintiff continued, saying "[her] arms were just so heavy. . . . I . . . couldn't do nothing. I would come home from work, and I would set. . . . I just was so drained. I didn't want to do anything." (*Id.*, PageID.101.)

Plaintiff testified that she can sit for about an hour, then she has to get up and walk. (*Id.*, PageID.105.) She experiences sciatica three to four times per week. (*Id.*) She can stand for 20 to 30 minutes. (*Id.*) She uses a cane about at least four times per week. (*Id.*, PageID.106.) Plaintiff initially said she uses the cane depending on "how bad [she is]." (*Id.*, PageID.108.) But later, she specifically clarified that she uses it five minutes of the day, or 20 minutes per week. (*Id.*, PageID.108–9.)

---

[5] Based on dialogue between the ALJ and Plaintiff's counsel at the hearing, it appears there is no diagnosis in the file for this. Plaintiff's hearing counsel stated that "there's no trigger point test that I saw in the record." (*Id.*, PageID.101.)

Plaintiff experiences pain with her left hip. (*Id.*, PageID.109.) She explained that there are times where she doesn't have hip pain, but bending down or squatting can increase pain. (*Id.*, PageID.109–10.)

Plaintiff wears braces on both of her wrists that she wears all day, except for eating, doing dishes, or washing her hands. (*Id.*, PageID.110–1.) Plaintiff can lift weight up to a gallon of milk, and she cannot open jars. (*Id.*, PageID.111.) When she lifts more weight than a gallon of milk, Plaintiff would expect her back to hurt. (*Id.*, PageID.112.)

Plaintiff vacuums for household chores. (*Id.*) It takes her long to complete that, as she will stop and sit down for a minute between rooms. (*Id.*)

### c.    The Vocational Expert's (VE) Testimony at the Administrative Hearing

The VE identified Plaintiff's past work[6], according to the Dictionary of Occupational Titles, as cashier II (light work, unskilled work, and SVP[7] of 2) and secretary

---

[6] There is a slight discrepancy over the qualities of Plaintiff's work in her testimony. First, Plaintiff was asked and answered:

> Q    All right. How much weight were you lifting? . . . Okay. Would you say that weight was over 20 pounds that you were lifting?
> A    Yes, Your Honor.
> Q    Okay. Over 50 pounds?
> A    No.

(*Id.*, PageID.91.) However, later, the VE double-checked about Plaintiff's cashier work-related weight lifting. The ALJ inquired of Plaintiff:

> Q    You know, what I heard the [Plaintiff] testify was that this David Stechschulte . . . that you were a cashier . . . and you were lifting *up to 20 pounds* is what I heard.
> A    Yes.
> Q    *Is that right*?
> A    *Yes.*

(*Id.*, PageID.102.) (Emphasis added.) The VE's analysis proceeded according to that more-limited weight restriction. It is not known if this discrepancy would make a difference for Plaintiff at this stage of her case, if this was properly addressed at the time.

[7] Appendix C:   Components of the Definition Trailer - DOT Dictionary of Occupational Titles, https://occupationalinfo.org/appendxc_1.html#II (last visited April 20, 2020). (SVP means specific vocational preparation, and it categorizes by number of months or years it takes to train for the position.)

(sedentary work, skilled work, and SVP of 6). (*Id.*, PageID.103.) The ALJ inquired of the VE at the administrative hearing about a hypothetical individual with plaintiff's characteristics. (*Id.*, PageID.103.) The ALJ added that the person could do light work; with a sit/stand option at will; who can only occasionally climb, balance, stoop, kneel, crouch, and crawl; who can frequently handle and finger bilaterally; who can frequently be exposed to non-weather related extremes of cold and heat; and never be exposed to hazards of moving machinery and unprotected heights in simple, routine, repetitive work. (*Id.*) The VE indicated that the stand/sit option would eliminate the cashier position, so a hypothetical plaintiff could not perform the past relevant work. (*Id.*, PageID.104.) The VE added the stand/sit option is not in the *Dictionary of Occupational Titles*, and that her opinion is based on her knowledge of these jobs and how they are done. (*Id.*) The VE determined that the hypothetical person could perform the jobs of either information clerk (56,000 jobs in the United States), office helper (113,000 jobs in the United States), or routers (140,000 jobs in the United States). (*Id.*) If the hypothetical was changed to occasional handling and occasional fingering, these jobs would be eliminated. (*Id.*, PageID.113.)

### F.     Governing Law

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B). The regulations carve the evidence into categories: "acceptable medical sources" and "other sources." 20 C.F.R. §§ 404.1513 (amended March 27, 2017), 416.913 (amended March 27, 2017). "Acceptable medical sources" include, among others, licensed physicians and licensed or certified psychologists. *Id.*

§§ 404.1513(a), 416.913(a). "Other sources" include medical sources who are not "acceptable" and almost any other individual able to provide relevant evidence. *Id.* §§ 404.1513(d), 416.913(d). Only "acceptable medical sources" can establish the existence of an impairment. SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006). Both acceptable and non-acceptable sources provide evidence to the Commissioner, often in the form of opinions "about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." *Id.* When acceptable medical sources issue such opinions, the regulations deem the statements to be "medical opinions" subject to a multi-factor test that weighs their value. 20 C.F.R. §§ 404.1527 (eff. Sept. 3, 2013 to Mar. 26, 2017), 416.927 (eff. Aug. 24, 2012 to Mar. 26, 2017). Excluded from the definition of "medical opinions" are various decisions reserved to the Commissioner, such as whether the claimant meets the statutory definition of disability and how to measure his or her RFC. *Id.* §§ 404.1527(d), 416.927(d).

The ALJ must use a six-factor balancing test to determine the probative value of medical opinions from acceptable sources. *Id.* §§ 404.1527(c) (eff. Sept. 3, 2013 to Mar. 26, 2017), 416.927(c) (eff. Aug. 24, 2012 to Mar. 26, 2017). The test looks at whether the source examined the claimant, "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); *see also* 20 C.F.R. §§ 404.1527(c), 416.927(c). ALJs must also apply those factors to "other

17

source" opinions. *See Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540–42 (6th Cir. 2007); SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006).

Because Plaintiff filed her claim before March 27, 2017, she is entitled to the benefit of the treating-source rule. Under that rule, certain opinions of a treating physician receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *see also Wilson*, 378 F.3d at 544. The only opinions entitled to dispositive effect deal with the nature and severity of the claimant's impairments. 20 C.F.R. §§ 404.1527(d), 416.927(c)(2). Therefore, the ALJ does not owe a treating opinion deference on matters reserved to the Commissioner. 20 C.F.R. §§ 404.1527(d), 416.927(d).

The regulations mandate that the ALJ provide "good reasons" for the weight assigned to a treating source's opinion in the written determination. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *see also Dakroub v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). Therefore, a decision denying benefits must give specific reasons, supported by record evidence, for the weight granted to a treating source's opinion. *Rogers*, 486 F.3d at 242. For example, an ALJ may properly reject a treating source opinion if it lacks supporting objective evidence. *Revels v. Sec'y of Health & Human Servs.*, 882 F. Supp. 637, 640–41 (E.D. Mich. 1994), *aff'd*, 51 F.3d 273 (Table), 1995 WL 138930, at *1 (6th Cir. 1995).

The claimant must provide evidence establishing his or her RFC. The statute lays the groundwork for this, stating, "An individual shall not be considered to be under a

disability unless he [or she] furnishes such medical and other evidence of the existence thereof as the Secretary may require." 42 U.S.C. § 423(d)(5)(A); *see also Bowen*, 482 U.S. at 146 n.5. The RFC "is the most he [or she] can still do despite his [or her] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. § 404.1545(a)(2).

According to SSR 16-3p, an ALJ must analyze the consistency of the claimant's statements with the other record evidence, considering his or her testimony about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in the Social Security Ruling. SSR 16-3p, 2016 WL 1119029 (Mar. 16, 2016). This analysis and the conclusions drawn from it—formerly termed a credibility determination—can be disturbed only for a "compelling reason." *Sims v. Comm'r of Soc. Sec.*, 406 F. App'x 977, 981 (6th Cir. 2011); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004).

The Social Security regulations establish a two-step process for evaluating subjective symptoms, including pain. 20 C.F.R. § 404.1529(a) (2016); SSR 16-3p, 2016 WL 1119029, at *2 (March 16, 2016). The ALJ evaluates complaints of disabling pain by confirming that objective medical evidence of the underlying condition exists. The ALJ then determines whether that condition could reasonably be expected to produce the alleged pain or whether other objective evidence verifies the severity of the pain. *See* 20 C.F.R. § 404.1529 (2016); SSR 16-3p, 2016 WL 1119029, at *2 (March 16, 2016); *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994). The ALJ ascertains the extent of the work-related limitations by determining the intensity, persistence, and

limiting effects of the claimant's symptoms. SSR 16-3p, 2016 WL 1119029, at *6 (March 16, 2016).

While "objective evidence of the pain itself" is not required, *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986) (quoting *Green v. Schweiker*, 749 F.2d 1066, 1071) (3d Cir. 1984)) (internal quotation marks omitted), a claimant's description of his or her physical or mental impairments will "not alone establish that [he or she is] disabled." 20 C.F.R. § 404.1529(a). The absence of objective, confirming evidence obligates the ALJ to consider the following factors:

(i)     [D]aily activities;
(ii)    The location, duration, frequency, and intensity of . . . pain;
(iii)   Precipitating and aggravating factors;
(iv)    The type, dosage, effectiveness, and side effects of any medication . . taken to alleviate . . . pain or other symptoms;
(v)     Treatment, other than medication, . . . received for relief of . . . pain;
(vi)    Any measure . . . used to relieve . . . pain.

20 C.F.R. § 404.1529(c)(3), 416.929(c)(3) (2016); *see also Felisky v. Bowen*, 35 F.3d 1027, 1039–40 (6th Cir. 1994); SSR 16-3p, 2016 WL 1119029, at *7 (March 16, 2016).

### G.     Arguments and Analysis

#### 1.     Substantial evidence supports the ALJ's RFC

Plaintiff argues that a medical opinion that the ALJ relied upon was outdated, in that there is no link the medical record to the Plaintiff's RFC. I disagree.

Plaintiff describes the time period starting with the examination by Dr. Choi, the state agency doctor, in July 2016 (*Id.*, PageID.139–142), which predates Plaintiff's right hip arthroscopy on January 10, 2017 (*Id.*, PageID.527) and her developing-issues with her left hip (*see id.*, PageID.900), ultimately leading to left hip surgery after the hearing before

the ALJ. (Pl. Br., ECF No. 14, PageID.925, 929.)[8] However, reference to evidence occurring after the ALJ's final decision is not a part of the record for review for substantial evidence. *See* 20 C.F.R. § 404.981; *Meeks v. Sec'y of Health & Human Servs*, 996 F.2d 1215, 1993 WL 216530, at *1 (6th Cir. 1993) (unpublished); *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001) (Evidence supplied to the Appeals Council "cannot be considered part of the record for purposes of substantial evidence review.")

Plaintiff argues that under the *Deskin* case[9], the ALJ needed a more fully developed record to consider evidence since Dr. Choi's July 2016 opinion. But, the ALJ considered all the evidence on the whole record, as discussed above in the review of the medical evidence, and particularly notable here was the consideration of the January 2018 opinion of Dr. Taunt discouraging Plaintiff from lifting items of greater than 50 pounds and other activities that could lead to component failure. (*Id.*, PageID.903.) "[I]t is not error for an ALJ to rely on medical opinions from physicians who have not reviewed the entire record so long as the ALJ considers the post-dated evidence in formulating his opinion." *Hahn v. Comm'r of Soc. Sec.*, No. 3:17 CV 897, 2018 WL 4510112, at *8 (N.D. Ohio Sept. 20, 2018).

The ALJ adopted an RFC with greater limitations than discussed in Dr. Choi's records. If greater limitations beyond the adopted RFC are to be considered, it is Plaintiff's burden to supply evidence. *See Johnson v. Comm'r of Soc. Sec.*, No. 11-cv-14644, 2013

---

[8] Plaintiff's Brief at these pages refers to a left hip surgery in September 2018, and cites ECF No. 11, PageID.71, which is a page in the transcript of the August 2018 ALJ decision that denied DIB.

[9] *Deskin v. Comm'r of Soc. Sec.,* 605 F. Supp. 2d 908 (N.D. Ohio, Oct. 10, 2008).

WL 812081, at *6 (E.D. Mich. Feb. 12, 2013) ("Without a differing opinion, the ALJ was entitled to rely on the findings of the state agency consultant." (citing *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 596 (6th Cir. 2005))), adopted, 2013 WL 811788 (E.D. Mich. Mar. 5, 2013); *Jordan v. Comm'r of Soc. Sec.*, 548 F.3d 417, 423 (6th Cir. 2008) (the claimant bears the burden of demonstrating the need for a more restrictive RFC).

For these reasons, substantial evidence supports the ALJ's adopted RFC.

### 2.    ALJ appropriately considered the use of a cane in making the RFC.

Plaintiff argues that the use of a cane is needed in forming Plaintiff's light work RFC, and further consideration of that restriction is absent from the RFC. I disagree.

While Plaintiff indicated in her 2016 function report that a cane was prescribed (*id.*, PageID.304), and while the 2016 ALJ decision in Plaintiff's prior disability case indicated that a cane was prescribed (*id.*, PageID.123), this transcript record does not articulate what are the circumstances when Plaintiff requires a cane.[10] In any event, Plaintiff herself testified that she uses a cane "at least four times a week" (*id.*, PageID.106) and she further explained that that means she uses the cane for 20 minutes per week. (*Id.*, PageID.109.) She doesn't use the cane as frequently in doors, specifically her house, "because there are things that I can hang onto in my house." (*Id.*, PageID.106.)

---

[10] *See* SSR96-9p. ("To find that a hand-held assistive device is medically required, there must be medical documentation establishing the need for a hand-held assistive device to aid in walking or standing, and describing the circumstances for which it is needed (i.e., whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information)."

To the extent that Plaintiff's argument relies on evidence of a September 2018 left hip surgery, that argument fails for the same reasons regarding Plaintiff's substantial evidence arguments above.

To the extent that the use of a cane suggests there are problems with ambulation, the severity of the problem is limited by Plaintiff's admitted limited use, and by the medical records showing strength in her lower extremities. These circumstances—combined with Plaintiff's limited range of walking and corresponding need for rest, and combined with the ALJ's stand/sit option in the RFC—show appropriate consideration of Plaintiff's cane usage.

Finally, I note that use of a cane is not incompatible with light work. *See Perdue v. Colvin*, No. 15-CV-14006, 2017 WL 362668, at *6 (E.D. Mich. Jan. 9, 2017), adopted 2017 WL 976790 (E.D. Mich. Mar. 14, 2017).

### 3. ALJ appropriately considered Plaintiff's COPD in making the RFC.

Plaintiff argues that the RFC should have included a clean air environment free of odors, perfumes, and dust. Further, defendant posits that the ALJ's citation to medical evidence does not clearly show reasoning for the adopted RFC. By engaging with the whole record evidence, Plaintiff's COPD and asthma are non-severe impairments and the resulting RFC considers her abilities appropriately.

"An impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities." 20 C.F.R. §

416.922. Further, it is Plaintiff's burden to provide evidence of the severity of her medically determinable impairments. *See Bowen v. Yuckert*, 482 U.S. 137, 146 (1987).

Plaintiff reported her condition in March 2016 to Dr. Allam as follows: "[Plaintiff] complains of shortness of breath, chest tightness, wheezing, cough (unsure of color), chills, and pleuritic chest pain (at times) but denies any fever. Shortness of breath is aggravated by climbing stairs and exertion." (*Id.*, PageID.347.) But the reported physical examination of Plaintiff, in March 2016, was that Plaintiff's chest and lung exams were "Clear without wheezes, rales, or rhonchi, normal excursion with symmetric chest walls, normal resonance, no flatness or dullness and non-tender and normal tactile fremitus." (*Id.*, PageID.348). Similar chest and lung exam results were reported in September 2016 (*see id.*, PageID.495), March 2017 (*see id.*, PageID.494), and September 2017. (*see id.*, PageID.482.) Further, similar to the March 2016 time period, in May 2016, Plaintiff reported to Dr. Botta that "She has been getting sick often and has recently been treated for exacerbation of asthma several times in the last six months." (*Id.*, PageID.352.) Yet again, here, physical examination of Plaintiff reveals "On auscultation of the lungs, air entry was equal bilaterally and there were no adventitious sounds." (*Id.*)

Plaintiff's spirometry tests revealed improvement in August 2016 (*id.*, PageID.498), no change in September 2016 (*id.*, PageID.496), a significant decline in March 2017 (*id.*, PageID.494), and a significant increase in September 2017. (*Id.*, PageID.482.)

Plaintiff's asthma report in July 2017 does indicate that strong perfumes can cause an asthma attack, and that attacks "come on when they please." (*Id.*, PageID.297.) But

24

Plaintiff also indicates that in the last year, she was not hospitalized, or treated by a doctor or emergency room for her asthma. (*Id.*, PageID.296.)

Plaintiff's self-reported conditions alone cannot establish a severe impairment. *See Kornecky v. Comm'r of Soc. Sec.*, 167 Fed.Appx. 496, 498 (6th Cir., 2006). Further, when doctor's reports do not reveal the intensity, frequency, or duration of a condition, the Court of Appeals has upheld a finding of no severe impairment. *See Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir., 1988) (arthritis).

In the instant case, even if one were to give greater weight to Plaintiff's subjective reporting, there is no indication that Plaintiff's capabilities of responding to her asthma attacks significantly limits her work activity beyond what was established in the RFC. Further, the medical records described above are not supportive of additional restrictions, and they show an ability for Plaintiff to control her condition.

### H.    Conclusion

For these reasons, I would conclude that substantial evidence supports the Commissioner's denial of benefits and I recommend **DENYING** Plaintiff's Motion, (ECF No. 14), **GRANTING** the Commissioner's Motion, (ECF No. 15), and **AFFIRMING** the Commissioner's final decision denying benefits.

## III.   <u>REVIEW</u>

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed.

R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  May 4, 2020                          S/ PATRICIA T. MORRIS
                                            Patricia T. Morris
                                            United States Magistrate Judge

## <u>CERTIFICATION</u>

I hereby certify that the foregoing document was electronically filed this date through the Court's CM/ECF system which delivers a copy to all counsel of record.

Date: May 4, 2020                              By s/Kristen Castaneda
                                               Case Manager